CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
MAY 27 2008
JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| KATHY L. SMITH, for Vernon Smith, deceased, <br>         Plaintiff <br><br> v. <br><br> MICHAEL J. ASTRUE, <br> Commissioner of Social Security, <br><br>         Defendant | ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 7:07cv00314 <br> ) <br> ) By:   Hon. Michael F. Urbanski <br> )         United States Magistrate Judge <br> ) <br> ) |

## MEMORANDUM OPINION

In this appeal of a denial of social security disability benefits, Kathy L. Smith, on behalf of her deceased husband, Vernon Smith ("Smith"), contends that he was disabled due to back and neck problems, sleep apnea and associated fatigue and depression. Two treating physicians, orthopedic and neurologic specialists, and an independent consulting medical expert, indicated that Smith's back and neck problems did not prevent him from working at the sedentary level of exertion. Thus, there is substantial evidence to support the Commissioner's decision that Smith's back and neck problems are not disabling. Likewise, there is no evidence to suggest that Smith's depression was at a disabling level. However, the Commissioner did not meet his burden of demonstrating that there were jobs in significant numbers in the national economy that Smith could perform given his sleep apnea and resulting fatigue. While the Commissioner argues that a sedentary job would account for such an impairment, the vocational evidence presented at the second administrative hearing was inconclusive at best and does not satisfy the Commissioner's burden at step five of the sequential evaluation process. As such, the decision

of the Commissioner must be reversed and the case remanded for calculation of payment of benefits.

I.

A reviewing court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

II.

Smith worked for a number of years in the landscaping, contracting and maintenance fields, and his most significant employment was working for a pest control company for eight years. While working in pest control, Smith fell and injured his shoulder. Smith was not able to return to that work, which required crawling under houses and other such efforts, due to his injury. Thereafter, Smith tried working at a newspaper and at a manufacturing plant, but could not do those jobs due to bending and stooping. Administrative Record (hereinafter "R." at 291-

2

Case 7:07-cv-00314-mfu   Document 22   Filed 05/27/08   Page 2 of 14   Pageid#: 88

92) Smith was 40 years old when he applied for disability insurance and supplemental security income benefits as of November 2, 2003.

Smith's claimed impairments are interrelated, in that he claims that the pain from his neck and shoulder keep him from sleeping and the pain affects his mood. (R. 293-96) The Administrative Law Judge found that Smith had severe impairments consisting of "morbid obesity, degenerative disc disease, sleep apnea, osteoarthritis, bilateral rotator cuff syndrome, hypertension, and pericardial effusion (diagnosed November 19, 2005)." (R. 17)

On November 19, 2005, Smith was admitted to the hospital for chest pressure and was determined to have a large pericardial effusion of uncertain, perhaps viral, origin.[1] (R. 270-72) After a few days of hospitalization, Smith's condition improved such that he was discharged on November 23, 2005. Tragically, Smith died the next day.

### III.

There is no dispute that Smith suffered from shoulder, neck and degenerative joint problems. Despite these problems, the record contains substantial evidence to support the ALJ's finding that these physical problems did not preclude Smith from any substantial gainful activity.

Prior to 2005, Smith lived in Pulaski, Virginia, and most of his medical care was rendered by the Pulaski Free Clinic or hospital emergency rooms. Smith had a long history of hypertension, and many of his medical visits concern his uncontrolled blood pressure. Smith had orthroscopic rotator cuff surgery in 2002 and complained of back pain following a fall in 2004.

---

[1]Pericardial effusion refers to the collection of serous or purulent exudate (fluid) in the cavity surrounding the heart. Dorland's Illustrated Medical Dictionary, 1400 (30th Ed. 2003).

In early 2005, Smith moved from Pulaski, Virginia to Bluefield, West Virginia and began being seen at the Bluestone Health Center.[2] Over the next several months, Smith was treated at Bluestone for uncontrolled hypertension, neck pain and degenerative joint disease. Smith was treated primarily by a nurse practitioner, but was seen twice in the spring by Dr. Yoginder Yadav as he requested a prescription for Lortab. On Smith's first visit with Dr. Yadav, on March 18, 2005, Dr. Yadav examined Smith and gave him one prescription for Lortab. Dr. Yadav's notes do not reflect any occupational limitations for Smith other than not driving or operating heavy machinery while on Lortab. (R. 208) Two weeks later, on April 1, 2005, Smith again requested a prescription of Lortab. Dr. Yadav's note indicates that due to issues concerning Smith's urine screen, he would not be able to prescribe Lortab to him. Smith became upset and left. (R. 206)

Three months later, on July 19, 2005, Dr. Yadav completed a Physical Examination Report and a Medical Source Statement: Functional Ability Guidelines. The Physical Examination Report generally reflects Smith's history of hypertension, degenerative joint disease/arthritis and chronic neck and back pain yet only notes "high blood pressure (non-compliant with treatment), " (R. 246), under the category Abnormal Findings/Current/Chronic Illnesses. The functional ability checklist indicates that Smith can occasionally lift up to 10 pounds, can stand and walk less than one hour, can handle frequently and can sit occasionally. The note indicates that Smith will be absent about twice a month. Dr. Yadav wrote that Smith was "unable to work due to neck, low back pain and arthritis." (R. 241)

---

[2]Smith described the move to West Virginia as follows: "Well, basically, we've lost everything we had. Lost our house, car, everything. We had to move back to West Virginia to try to get insurance. My wife's brother bought us a house to live in." (R 293)

4

Bluestone Health Center referred Smith to two specialists, orthopedist Dr. Yogesh Chand and neurologist Dr. Jeffrey A. Greenberg, each of whom treated Smith in 2005. Dr. Greenberg saw Smith on March 30, 2005 for a neurological consultation. Dr. Greenberg's note is remarkable for its lack of any significant findings. Dr. Greenberg noted that Smith had numerous complaints of back and neck pain, but his neurological examination was largely normal. (R. 217-18) In particular, the range of motion of the cervical and lumbar spine were normal. (R. 218) Dr. Greenberg also reviewed recent MRI scans of the cervical and lumbar spine and commented "[p]atient has multiple level mild cervical spondylosis with no major compromise of the neural canal. There is some straightening of the cervical spine. MRI of the lumbar spine looks rather benign with only slight bulge of the disc at L4-5." (R. 218) Dr. Greenberg noted that Smith weighed almost 300 pounds, and recommended weight loss, exercise and smoking cessation. (R. 217-19)

Dr. Chand saw Smith three times in 2005, in April, September and November. Consistent with Dr. Greenberg's history, Dr. Chand's note indicates that Smith told him that he had problems with his neck for ten years. (R. 226, 218) Smith told Dr. Chand that his pain had increased to the point where it was constant and severe, affecting his ability to sleep and walk for long periods of time. (R. 226) In addition to his neck pain, Smith complained of pain in his low back, shoulders, ankles, and knees. (R. 226-27) Dr. Chand's physical examination revealed some mild pain on lateral bending of the neck and mild tenderness at the C6-C7 level. (R. 228) Flexion of the shoulders was accompanied by pain at the end points. Smith's "mental status was clear and the mood was appropriate. He was oriented and coordinated and had clear mentation." (R. 228) Dr. Chand's review of the MRI's showed "moderately advanced osteoarthritis at

5

multiple levels with lateral stenosis and spinal stenosis. MRI studies of the lumbar spine however showed only mild osteoarthritis at the L4-L5 level." (R. 229) Dr. Chand recommended no surgery, and opined "[w]ith respect to his functional capabilities, it is my opinion that he is capable of performing light-duty sedentary work where he is allowed to interchange his position at will. He should rarely be required to bend, stoop, crawl and squat." (R. 229)

Dr. Chand saw Smith again in September, 2005 for difficulty with his left shoulder. Smith told Dr. Chand that it is activity related and at times bothers him to sleep. (R. 278) Dr. Chand's examination revealed "a positive impingement maneuver with tenderness of the rotator cuff, " (R. 278), and moderate stiffness of his neck. Smith was given a cortisone injection for his shoulder and was recommended to be referred for pain management of his chronic neck and back pain. (R. 279). Dr. Chand saw Smith again on November 14, 2005, ten days before his death, and the findings were consistent with the September visit. Dr. Chand's impression was of moderately advanced osteoarthritis of his neck, chronic rotator cuff syndrome of both shoulders, mild carpal tunnel syndrome and mild degenerative joint disease of the thoracic and lumbar spine. (R. 277) Dr. Chand noted that Smith was considerably overweight and described his treatment of Smith as "primarily supportive" as Smith declined shoulder surgery. (R. 277)

At the administrative hearing on August 16, 2005, Dr. Ward Stevens testified as a medical expert that Smith's impairments did not meet any listings and that Smith "was capable of performing light duty and sedentary work where he's allowed to have a sit/stand option and should be rarely required to bend, stoop, crawl, and squat." (R. 310) Dr. Stevens relied principally on the medical records of Drs. Chand and Greenberg.

6

The ALJ considered all of these medical records and opinions concerning Smith's joint problems, and decided that Smith retained the residual functional capacity ("RFC") to perform certain sedentary work. The ALJ expressly addressed Dr. Yadav's opinion, and noting that it conflicted with Smith's wide variety of daily activities, concluded that it not be given controlling weight. Instead, the ALJ relied on the opinion of Dr. Chand and gave it some weight along with the opinion of Dr. Stevens, which was accorded greater weight. Given the few number of times Dr. Yadav saw Smith and the medication seeking nature of those contacts as reflected in the medical records, the ALJ was well justified in relying on the opinions of Drs. Chand and Stevens as opposed to the Functional Ability Guidelines form completed by Dr. Yadav. Consideration of all of the medical records, especially the records from the neurology and orthopedic specialists, Drs. Greenberg and Chand, and the medical expert, Dr. Stevens, yields the conclusion that substantial evidence supports the RFC determined by the ALJ. Two other issues, concerning Smith's depression and fatigue, remain.

## IV.

Smith asserts that the Commissioner erred by not finding his depression to be a severe impairment. The ALJ considered Smith's anxiety and depression but found these symptoms not to constitute a severe impairment as they caused only minimal functional limitations when completing work-like activities. (R. 20) The ALJ concluded that "[t]he documentary evidence shows that the claimant was able to perform a wide variety of daily activities and maintained a productive lifestyle, despite his alleged depression and wrist pain." (R. 20) The ALJ noted that Smith had not sought any ongoing treatment for his mental condition, and a Psychiatric Review Technique performed by state agency psychologist Julie Jennings, Ph.D., concluded that Smith's

depression was not severe and posed only mild functional limitations. (R. 188, 198) There are no medical opinions finding to the contrary. As such, the Commissioner's decision in this regard is supported by substantial evidence.

## V.

Smith complained frequently about fatigue and sleepiness. At the administrative hearing, Smith stated that "I stay exhausted all the time, just constantly tired, feeling like I was going to pass out. . . . I mean, completely exhausted. I get real sleepy during the day." (R. 291, 294) Early on, in December, 2002, Smith saw a family doctor, Dr. Craig D. Schmalzried, complaining of depression and lack of energy. Dr. Schmalzried noted that this condition followed his shoulder surgery and being off work. Sleep apnea was discussed as a possibility as Smith reported snoring and waking up gasping. (R. 131)

In April, 2003, Smith was seen again by his family doctor complaining of weakness, fatigue, low energy and hypertension. Smith was tested for the oxygen saturation of his arterial blood which noted marked decreased oxygen levels and profound sleep apnea. (R. 146) A sleep study was scheduled, but apparently not done. (R. 246, 294) While frequently mentioned thereafter in his medical notes, Smith's sleep apnea was not treated again until after he moved to West Virginia in 2005 and began treatment at the Bluestone Health Clinic.

A sleep apnea evaluation was performed by Dr. Vishnu A. Patel, a pulmonologist, on March 14, 2005. Smith reported to Dr. Patel that he has excessive day time sleepiness and feels weak, fatigued, tired and exhausted. (R. 239) Smith reported that he tries to get eight to nine hours of sleep a night and occasionally gets up choking. (R. 239) Dr. Patel performed a pulmonary function test which did not reveal any significant airway obstruction. Some evidence

8

of a restrictive lung disorder was noted. (R. 240) Dr. Patel strongly suspected obstructive sleep apnea ("OSA"), but not narcolepsy. Dr. Patel suggested an overnight polysomnography study to investigate further. (R. 240)

For whatever reason, a sleep study was not performed on Smith until after this issue was raised during the first administrative hearing on August 16, 2005. (R. 327) Immediately following the hearing, steps were undertaken to obtain both a sleep study and a psychological evaluation. (R. 251) A sleep study was performed on Smith on September 22, 2005, which demonstrated severe obstructive sleep apnea ("OSA"). (R. 266) Dr. Patel's consultation note, dated October 5, 2005 noted "[s]evere OSA syndrome causing significant persistent oxygen desaturation which is the cause of excessive day time sleepiness, feeling fatigued, tired and exhausted. This can also impair the quality of life. Sometimes those patients may have a hard time to do any kind of job. He needs to work on weight reduction. I have discussed different treatment options with him and he has opted to choose for CPAP therapy."[3] (R. 265) Smith was not able to begin CPAP therapy in October due to a dental issue, and Dr. Patel's note dated November 1, 2005 describes "[e]xcessive daytime sleepiness" and states that Smith's severe OSA "does absolutely need aggressive therapy considering his underlying medical condition as well as daytime symptoms." (R. 264) On November 8, 2005, Dr. Patel completed a Clinical Assessment of Fatigue in which he noted the following:

> 1. Fatigue is present, to such an extent as to be distracting to adequate performance of daily activities or work.

---

[3] A CPAP machine delivers continuous positive airway pressure while a patient sleeps.

9

Case 7:07-cv-00314-mfu   Document 22   Filed 05/27/08   Page 9 of 14   Pageid#: 95

> 2. Physical activity, such as walking, standing, and bending greatly increases fatigue, causing abandonment of tasks related to daily activities or work.
>
> 3. Patient's activities including driving is limited due to excessive daytime sleepiness. He was diagnosed with very severe sleep apnea. CPAP therapy will be started soon and should hopefully improve his symptoms over time.

(R. 269) Smith never got to the point of deriving any benefit from CPAP therapy as he died two weeks later.

There is no dispute that Smith suffered from fatigue and sleepiness due to severe obstructive sleep apnea. Such a condition was suspected as early as 2002 and diagnosed in 2003, but treatment was not begun until too late in 2005. Objective tests confirm the fact that Smith simply did not get sufficient oxygen saturation and rest while sleeping. The ALJ considered Smith's sleep apnea to be a severe impairment, and the Commissioner argues that the RFC, set at the level of sedentary work, should account for Smith's fatigue.

The ALJ found that Smith could not return to his past relevant work due to his myriad severe impairments. As a result, in order to find a claimant not disabled, the Commissioner bears the burden of providing evidence that other work exists in significant numbers in the national economy that the claimant can do. See 20 C.F.R. §§ 404.1512(g), 404.1560(c). Review of the transcript of the second administrative hearing at which vocational issues were addressed yields the inescapable conclusion that the Commissioner did not meet his burden of showing that there were jobs Smith could do once his sleep apnea and fatigue were considered.

The ALJ crafted a hypothetical question based on the assessment of fatigue determined by Dr. Patel and posed it to a vocational expert ("VE") as follows:

10

ALJ: My hypothetical individual would have fatigue to such an extent that it would be distracting to adequate performance of daily activities or work, and physical activities such as walking, standing, and bending greatly increases fatigue causing abandonment of tasks related to daily activities or work. With those limitations could my hypothetical individual perform any of the sedentary, unskilled jobs you've named?

VE: I guess it goes again to the kind of frequency and duration. Is he able to be productive? Is the hypothetical individual able to be productive, you know, in an eight-hour workday? That's the – it's kind of difficult, it's kind of a general hypothetical that it's difficult to deal with.

ATTY: Yeah.

ALJ: And as I say, I have a hard time getting my hands around it because the way the –

ATTY: The doctor says he –

ALJ: – Dr. –

ATTY: his activities including driving is limited due to excessive daytime sleepiness

VE: If the individual is not able to perform an eight-hour workday due to fatigue, then he's – and be productive, then he probably wouldn't be able to perform the jobs that I've provided. If he can make an eight-hour workday and he's productive, he would be, he may not be the best worker but he would be able to be, he would be employable, capable of SGA.

ALJ: Well, I guess asked a different way, the sedentary jobs aren't going to require walking, standing, and bending. Correct? They're primarily seated positions.

VE: Correct. As long as he's, I guess it goes back to staying awake. If he sleeps, then it could be a problem. It's hard to sleep and be productive, especially in these unskilled jobs

11

>                that require, you know, where you're doing repetitive
>                functions.

(R. 346-348)

In response to the hypothetical, the VE's testimony was equivocal. Essentially, the VE testified that jobs would be available for a hypothetical person with Smith's fatigue issues if he could work for eight hours, but no jobs would exist if he was too fatigued to work an eight hour day. (R. 347) The ALJ's decision does not reflect this obvious ambiguity, and instead merely concludes that Smith was "capable of making a successful adjustment to other work." (R. 24) At step five, the Commissioner bears the burden of showing "that the claimant can engage in a job that 'exist[s] in significant numbers in the national economy.'" Morgan v. Barnhart, 142 Fed. App'x. 716, 719 (4th Cir. 2005)(quoting 20 C.F.R. § 404.1560(c)(1)). The Fourth Circuit explained:

> In deciding whether the Commissioner has met [his] burden, the ALJ generally must accept evidence from a vocational expert, who, based on the claimant's age, education, work experience, and RFC, testifies whether there are jobs for such a person in the national economy. See 20 C.F.R. § 404.1520(g)(1). The Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989).

Morgan v. Barhart, 142 Fed. App'x. at 719. Here, the ALJ's reliance upon the VE's testimony is misplaced as the VE was never able to conclude that a person having Smith's fatigue and daytime sleepiness issues could perform the jobs identified. At most, the VE was only able to say that Smith may or may not be able to perform these jobs, depending on just how sleepy and fatigued he gets. Such equivocation does not meet the Commissioner's burden at step five.

12

The Commissioner counters by arguing that Smith's fatigue was factored into his RFC because the RFC limits him to sedentary jobs which do not require walking, standing and bending. However, when asked the specific question as to whether limiting Smith to sedentary jobs took care of the fatigue issue, the VE still was not able to provide a unequivocal answer. Instead, the VE testified that if Smith was fatigued to the point of sleeping, "then it could be a problem. It's hard to sleep and be productive, especially in these unskilled jobs that require, you know, where you're doing repetitive functions." (R. 347-48) In no respect can such an equivocal response by the VE meet the Commissioner's obligation at step five to show that jobs exist that Smith can perform.

The Commissioner also argues that Smith's sleep apnea and fatigue cannot be considered disabling because it is treatable and is likely to improve. At the administrative hearing, Dr. Stevens dismissed Smith's sleep apnea and fatigue because it is treatable. (R. 305-06) The Commissioner also relies on Dr. Patel's note of November 8, where he stated that "CPAP therapy will be started soon and should hopefully improve his symptoms over time." (R. 269) It is well established that impairments which are remediable by treatment or medications are not disabling. Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). While Dr. Patel was hopeful that CPAP therapy would help Smith, there is no way to know that this therapy indeed would have helped as he died suddenly just as the treatment was getting started. The fact remains that Smith's sleep apnea and fatigue had not improved by his death, and it is simply unknown as to whether the CPAP would have ameliorated his impairment.

13

Because of the equivocation by the VE and the Commissioner's failure to meet his burden at step five, the court is constrained deny the Commissioner's motion for summary judgment and reverse and remand this case for calculation of a benefit payment.

The Clerk of Court hereby is directed to send a copy of this Memorandum Opinion to all counsel of record.

Enter this 27th day of May, 2008.

/s/ Michael F. Urbanski
Michael F. Urbanski
United States Magistrate Judge

14